**PROFESSIONAL LAWN CARE ASSO-CIATION, Plaintiff–Appellee,**

v.

**VILLAGE OF MILFORD,
Defendant–Appellant.**

No. 89–2141.

United States Court of Appeals,
Sixth Circuit.

Argued June 14, 1990.

Decided Aug. 1, 1990.

Kenneth A. Flaska, John J. Ronayne, III, Kasiborski, Ronayne & Flaska, Detroit, Mich., Joseph D. Lonardo (argued), Vorys, Sater, Seymour & Pease, Columbus, Ohio, for plaintiff-appellee.

Patti A. Goldman (argued), Public Citizen Litigation Group, Washington, D.C., Paul V. Groth, Connelly, Crowley & Groth, Walled Lake, Mich., for defendant-appellant.

Before MILBURN and NELSON, Circuit Judges, and ENGEL, Senior Circuit Judge.

MILBURN, Circuit Judge.

The defendant-appellant, Village of Milford, Michigan, enacted Ordinance No. 197, which imposes registration, posting and notice requirements upon commercial "users of pesticides." The district court enjoined the village from enforcing the ordinance on the ground that it was impliedly preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C.

§§ 136–136y. The village then filed this timely appeal. For the reasons that follow, we affirm.

### I.

#### A.

Defendant-appellant Village of Milford is a political subdivision of the State of Michigan. Plaintiff-appellee Professional Lawn Care Association of America is a national organization that represents approximately 1,400 commercial lawn care companies, including seven that are located in the village.

On January 27, 1986, the village enacted Ordinance No. 197, entitled

AN ORDINANCE TO PROVIDE FOR THE PUBLIC HEALTH AND SAFETY BY REQUIRING REGISTRATION OF PERSONS APPLYING PESTICIDES FOR HIRE WITHIN THE VILLAGE OF MILFORD AND PUBLIC NOTICE OF THE USE OF PESTICIDES; TO PROVIDE THE PUBLIC THE OPPORTUNITY OF AVOIDING CONTACT WITH THESE PESTICIDES: AND TO IDENTIFY THE LOCATION OF FLAMMABLE PESTICIDES.

The ordinance defines a "user of pesticide" as:

(1) Any person who applies or causes pesticides to be applied to property by any means where such person is engaged in applying pesticides for hire to trees, lawns, shrubs, plants, or the atmosphere; or

(2) Any person who applies or causes pesticides to be applied in commercial businesses and public buildings.

The ordinance requires all users of pesticides who use and apply pesticides for hire within the village to register with the village and pay an annual registration fee of $15.00. Users of pesticides who store, mix or otherwise handle pesticides within the village must provide the village fire department with a copy of their registration forms.

The ordinance requires users who apply pesticides to commercial businesses or public buildings to supply the building operators with decals that indicate the date the pesticides were applied. The decals must be posted at the building entrances until the time of the next application or ninety days, whichever occurs first.

Village residents whose physicians declare them to be "sensitive" to pesticides may, for an annual fee of $15.00, be placed upon the village's list of chemically sensitive residents. The village updates the list monthly. The ordinance requires all commercial users of pesticides to obtain current copies of the list and to notify the chemically sensitive residents at least twenty-four hours in advance of an outdoor application. The ordinance permits written notice where oral notice is not possible. In addition, users of pesticides must also place yard markers containing the words "Chemically Treated Lawn—Keep Children and Pets Off for 72 Hours" on the property where an outdoor application has been made. The ordinance provides that violations of its terms shall be penalized by assessments of fines ranging from $25 to $100, depending upon the number and type of violations.

The association initiated this action by filing a complaint seeking declaratory and injunctive relief on May 5, 1989. The association alleged that FIFRA preempts the local regulation of pesticides, such as Ordinance No. 197. The village answered the complaint on June 5, 1989, and soon thereafter the parties filed cross-motions for summary judgment.

On August 24, 1989, in a ruling from the bench, the district court granted the association's motion for summary judgment and enjoined the village from enforcing Ordinance No. 197. The district court filed an order memorializing its decision on September 15, 1989.

#### B.

FIFRA was originally enacted in 1947 as a pesticide labeling statute. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 991, 104 S.Ct. 2862, 2866–67, 81 L.Ed.2d 815 (1984). In 1972, in response to concerns about the safety of pesticide use, and "be-

cause of a growing perception that the existing legislation was not equal to the task of safeguarding the public interest," *id.* at 991–92, 104 S.Ct. at 2867, Congress rewrote FIFRA through amendments that transformed it into a comprehensive regulatory statute. *See id.* As amended, FIFRA "establishe[d] an elaborate framework for the regulation of pesticide use in the United States." *Love v. Thomas,* 858 F.2d 1347, 1350 (9th Cir.1988), *cert. denied;* — U.S. ——, 109 S.Ct.1932, 104 L.Ed.2d 403 (1989); *see also Defenders of Wildlife v. Administrator, EPA,* 882 F.2d 1294, 1296 (8th Cir.1989).

FIFRA contemplates various levels of interaction between the federal, state and local governments in the regulation of pesticides and their use. FIFRA defines a "state" as "a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa." 7 U.S.C. § 136(aa). FIFRA does not define "political subdivisions" or "local authorities." Some sections of FIFRA, however, refer explicitly to "political subdivisions" and "local agencies" as distinct from "states." *See* 7 U.S.C. §§ 136f(b); 136r(b); 136t(b).

FIFRA expressly permits states to regulate the use of federally registered pesticides, "but only if and to the extent the regulation does not permit any sale or use prohibited by" the federal statute. 7 U.S.C. § 136v [1]. FIFRA does not contain any provisions that authorize or prohibit political subdivisions or local authorities from regulating pesticides or their use.

Pursuant to the grant in section 136v, the State of Michigan enacted the Pesticide Control Act of 1976. Mich.Comp.Laws Ann. §§ 286.551—.581. The state largely adopted the federal standards, including FIFRA's certification standards for commercial applicators of pesticides. As a re-sult, commercial pesticide applicators are subject to extensive federal and state regulation in Michigan.

In making its decision, the district court turned first to FIFRA's legislative history, which reveals that the pesticide legislation President Nixon proposed in 1971 included provisions that expressly gave local governments the power to regulate pesticides and their use. However, nearly every congressional committee that passed on the proposed legislation deleted those provisions in the belief that the state and the federal governments could regulate pesticides adequately without subjecting the pesticide industry to thousands of regulatory jurisdictions. *See Maryland Pest Control Ass'n v. Montgomery County, Maryland,* 646 F.Supp. 109, 111–13 (D.Md. 1986), *aff'd without published opinion,* 822 F.2d 55 (4th Cir.1987), *further related proceedings,* 884 F.2d 160 (4th Cir.1989) (per curiam) (*"Maryland Pest Control"*). As a result, the legislation that Congress enacted contained no provisions granting local governments the power to regulate pesticides and their use. The district court concluded that when Congress amended FIFRA in 1972, it occupied the entire field of the regulation of pesticides "and then it specifically gave states [and not their political subdivisions] the right to operate within the field...." J.A. 33.

The district court also noted that the question of the preemption of local regulations of pesticides and their use had been decided in two reported opinions, with each court reaching different results. The United States District Court for the District of Maryland found a county ordinance nearly identical to the village's to be preempted in *Maryland Pest Control,* while the California Supreme Court found a voter-enacted ban on the aerial application of certain pesticides not to be preempted. *See People ex rel. Deukmejian v. County of Mendocino,*

---

**1.** § 136v Authority of States
　(a) In general
　　A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

　(b) Uniformity
　　Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

36 Cal.3d 476, 683 P.2d 1150, 204 Cal.Rptr. 897 (1984) ("*Mendocino County*").[2] The district court adopted the analysis in *Maryland Pest Control* and concluded that FIFRA preempted Ordinance No. 197.

## II.

### A.

■ In determining whether Congress has exercised its power to preempt state or local regulations, we give primary emphasis to ascertaining the congressional intent underlying the statute in question. *See R. J. Reynolds Tobacco Co. v. Durham County, North Carolina,* 479 U.S. 130, 140, 107 S.Ct. 499, 506–07, 93 L.Ed.2d 449 (1986). Congress may preempt a state or local law expressly or by passing a statute that is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary ... regulation." *Hillsborough County, Florida v. Automated Med. Labs., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Where the federal statute is not so large that it occupies the entire field, state and local law may still be preempted where it conflicts with the federal law by standing as an obstacle to Congress' purposes, *see Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300–02, 108 S.Ct. 1145, 1151, 99 L.Ed.2d 316 (1989), or where " 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state [or local] laws on the same subject.' " *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375 (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152).

---

**2.** The Wisconsin Supreme Court recently followed *Maryland Pest Control, see Mortier v. Town of Casey,* 154 Wis.2d 18, 452 N.W.2d 555 (1990), while the Supreme Judicial Court of Maine recently followed *Mendocino County, see Central Maine Power Co. v. Town of Lebanon,* 571 A.2d 1189 (Me.1990).

**3.** Determination of the meaning of a statute begins with the plain language of the statute itself. *See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, ——, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Bradley v. Austin,* 841 F.2d 1288, 1293 (6th Cir.1988). Because "use" and

■ Absent express language to the contrary, there is ordinarily a presumption against preemption, *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981), especially when the challenged state or local regulation concerns state or local health and safety matters. *See Hillsborough County,* 471 U.S. at 715, 105 S.Ct. at 2376. However, the failure of a federal statute to speak directly to preemption does not necessarily create a gap for state or local regulation. *See Adams Fruit Co. v. Barrett,* —— U.S. ——, 110 S.Ct. 1384, 1390–91, 108 L.Ed.2d 585 (1990).

### B.

■ The village claims that the district court's analysis was off-target because Ordinance No. 197 does not regulate pesticides or their use, but is merely a "public notice regulation" designed to protect the health and safety of village residents. We cannot agree because the unambiguous language of the ordinance imposes requirements that pesticide users must fulfill, and practices they must follow, before and after applying pesticides. By its plain terms, the ordinance regulates "users of pesticides," the application of pesticides, and conduct that concerns the application and use of pesticides.[3] Therefore, we conclude that Ordinance No. 197 is an attempt by a local government to regulate pesticides and their use. *See Maryland Pest Control,* 646 F.Supp. at 113; *see also New York State Pesticide Coalition, Inc. v. Jorling,* 874 F.2d 115, 117 (2d Cir.1989) (*state* public notice requirement held to be a permissible sale and use regulation).

---

"apply" are not defined by the ordinance, we interpret them "as taking their ordinary, contemporary, common meaning[s]." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Definitions of "apply" include "to put to use especially for some practical purpose" and "to ... lay or spread on," *Webster's Third New International Dictionary* 105 (1981), while definitions of the noun "use" include "a method or manner of using something" and "the privilege or benefit of using something." *Id.* at 2523.

## C.

FIFRA does not preempt the village ordinance by its express terms, which leaves resolution of this issue to a determination of whether Congress has preempted local regulation by implication. We are urged by the parties to join with the Wisconsin Supreme Court in adopting the rationale of *Maryland Pest Control, see Mortier v. Town of Casey,* 154 Wis.2d 18, 452 N.W.2d 555 (1990), or to adopt the opposing view and join the Supreme Judicial Court of Maine in following *Mendocino County, see Central Maine Power Co. v. Town of Lebanon,* 571 A.2d 1189 (Me.1990).

In *Mendocino County,* the California Supreme Court found that because FIFRA contemplates various levels of state and local interaction, Congress did not occupy the entire field, but merely joined the state and local governments in pesticide regulation. The court emphasized FIFRA's failure to limit the states' ability to delegate their authority to political subdivisions and the traditional regulatory powers of state and local governments.[4] The court concluded that as political subdivisions of states, local governments could regulate pesticide use. The court also reviewed FIFRA's legislative history and failed to find any express indications that Congress intended to deny local governments the power to regulate pesticide use.

In *Maryland Pest Control,* the district court concluded that through the 1972 amendments to FIFRA, Congress intended to enact, and did enact, a comprehensive statute that occupied the field of pesticide regulation. 646 F.Supp. at 110. The court found that by its terms, FIFRA opened specific portions of the field to state regulation and much smaller portions to local regulation. *Id.* at 111. The district court concluded that if it were to ignore the distinctions Congress drew between states and their political subdivisions, it would needlessly render vast portions of the statute superfluous and ignore Congress' intent to erect a broad federal regulatory framework. *Id.* The district court also found that legislative history demonstrated that both houses of Congress specifically considered, and specifically rejected, President Nixon's proposed provisions that would have allowed for local regulation of pesticides and their use. *Id.* at 111–13.

■ Our analysis of FIFRA and its legislative history leads us to conclude that when Congress rewrote the statute, it impliedly preempted the local regulation of pesticides, including Ordinance No. 197. It is well-established that the starting point in preemption analysis is congressional intent, and it is undisputed that the intent behind the 1972 amendments was to enact sweeping federal pesticide regulation. Congress transformed FIFRA into a statute that cast a regulatory net over pesticides and their use, in part by giving the EPA enforcement authority over the use, sale and labeling of pesticides. When seen in this context, the *Mendocino County* view that Congress only entered the field of pesticide regulation already occupied by state and local governments is, at best, strikingly inconsistent with the undisputed legislative intent.

Moreover, *Mendocino County* ignores the distinctions Congress drew in the express terms of the legislation. FIFRA contains several provisions that expressly refer to political subdivisions and local authorities as distinct from state governments and agencies. Additionally, Congress did not include political subdivisions in its definition of "states." *See* 7 U.S.C. § 136(aa). Where, as here, " 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress act[ed] intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo,*

---

4. Notably, a year after *Mendocino County* was decided, the United States Supreme Court held that Congress could control the states and regulate in areas that were previously thought to be insulated from a federal regulation because they were "traditional" areas of state and local control. *See Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 546–47, 105 S.Ct. 1005, 1015–16, 83 L.Ed.2d 1016 (1985).

472 F.2d 720, 722 (5th Cir.1972)); *see also Lynch v. Johns–Manville Sales Corp.*, 710 F.2d 1194, 1197 (6th Cir.1983). ("It is a fundamental rule of statutory construction that inclusion in one part of a congressional scheme of that which is excluded in another part reflects a congressional intent that the exclusion was not inadvertent.").

State law is preempted where it "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1151. As the district court pointed out, adoption of the *Mendocino County* view would allow the uniformity and comprehensiveness Congress sought to establish through FIFRA to be lost in the muddle of thousands of local standards and regulations. FIFRA would no longer stand as a sweeping federal regulatory framework but would become the lowest common denominator in an equation of infinite variables.

■ Courts need only to examine the legislative history of a statute when its terms are ambiguous or where enforcement of the plain terms of the statute would "produce a result demonstrably at odds with the intention of [the statute's] drafters." *Ron Pair Enterprises*, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). In this case, the district court reviewed the legislative history of the 1972 amendments and adopted the analysis in *Maryland Pest Control*. We, too, agree with the *Maryland Pest Control* analysis, and also with Judge Kaus, who dissented from *Mendocino County* in part because he found the decision was "based on an untenable reading of the legislative record." *Mendocino County*, 204 Cal.Rptr. at 911, 683 P.2d at 1164 (Kaus, J., dissenting). The lengthy history of the 1972 amendments to FIFRA demonstrates that both houses of Congress positively rejected President Nixon's proposal that local governments be permitted to regulate pesticides and their use. In addition, as noted in *Maryland Pest Control*, several of the committee reports explicitly stated an intent to deprive local authorities of the power to regulate pesticide use. *See Maryland Pest Control*, 646 F.Supp. at 112–13.

### III.

In the absence of explicit statutory language, there is a presumption against the preemption of local police powers. *See Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981). However, that presumption does not stand unrebutted merely because Congress failed to include a provision that expressly preempted state law. *See Adams Fruit Company v. Barrett*, —— U.S. ——, 110 S.Ct. 1384, 1390–91, 108 L.Ed.2d 585 (1990). In this case, the presumption against preemption is overcome because FIFRA, as amended in 1972 and thereafter, is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary ... regulation." *Hillsborough County*, 471 U.S. at 713, 105 S.Ct. at 2375. Moreover, the statutory language and the fundamental rules of statutory interpretation make it clear that Congress intentionally omitted states' political subdivisions from the section 136v grant of authority to regulate pesticides, and the legislative history demonstrates that Congress positively rejected the proposal to make room for local governments in the field of pesticide regulation.

Accordingly, for the foregoing reasons, the judgment of the district court is AFFIRMED.

DAVID A. NELSON, Circuit Judge, concurring.

The starting point in any analysis of the preemptive effect of an Act of Congress, it seems to me, must be the language of the act itself. The language of the act that is before us in this case manifests a clear intent *not* to preempt all state regulation of the use of pesticides. State regulation is often effected through locally adopted ordinances, of course, and insofar as the type of pesticide regulation at issue here is concerned, the statutory language does not necessarily indicate that Congress intended to rule out ordinances adopted by state

political subdivisions pursuant to authority conferred by state statute or state constitutional provision.

The legislative history, on the other hand, suggests about as strongly as it possibly could that Congress did indeed intend to keep the field of pesticide regulation clear of local ordinances. I would have felt more comfortable about carrying out this intent if Congress had done a better job of writing it into the law. I conclude, however, as the other members of the panel have done, that the Village of Milford's ordinance cannot be permitted to stand. I write separately because my reasoning differs somewhat from that of my colleagues and because this case presents an important question the proper resolution of which is by no means free of doubt.

I

The Federal Environmental Pesticide Control Act of 1972, Pub.L. No. 92–516, 89 Stat. 973, amended the Federal Insecticide, Fungicide and Rodenticide Act (now codified at 7 U.S.C. §§ 136 *et seq.*) to create a comprehensive system for regulating both interstate and intrastate distribution and use of pesticides. The 1972 legislation was not intended to occupy the field totally; in its present form, § 24(a) of the Act expressly declares that "[a] State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this Act...." 7 U.S.C. § 136v(a).

For purposes of the Act, the term "State" is defined as meaning what it says —"a State"—plus the District of Columbia and Puerto Rico, along with the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa. Section 2(aa) of the Act, 7 U.S.C. § 136(aa).[1] The statutory definition does not, on its face, exclude a state's political subdivisions.

In declaring that "[a] State may regulate the sale or use of any federally registered pesticide," similarly, § 24 of the Act says nothing about the agency or agencies through which the power of the state may be exercised. There is a sharp contrast, in this respect, between § 24 and § 4(a)(2); a section dealing with certification of competency in pesticide use and handling. The latter section, as currently codified at 7 U.S.C. § 136i(a)(2), provides in part as follows:

"If any State, at any time, desires to certify applicators of pesticides, the *Governor* of such State shall submit a State plan for such purpose. The Administrator shall approve the plan submitted by any State, or any modification thereof, if such plan in his judgment—

(a) designates *a State agency* as the agency responsible for administering the plan *throughout the State* ...." (Emphasis supplied.)

The Act imposes no corresponding requirements with respect to the type of regulations at issue in this case, which involve registration and notice but do not involve competency certification. Absent any such requirements, it would not be unreasonable to suppose that states are free to exercise their power outside the area of competency certification through whatever mechanism might seem most expedient to them.

Municipal bodies are "essentially creatures of the state." *South Macomb Disposal Authority v. Township of Washington,* 790 F.2d 500, 507 (6th Cir.1986) (Engel, J., concurring). They are "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them." *Kelley v. Board of Educ. of Nashville & Davidson County,* 836 F.2d 986, 994 (6th Cir.1987) (quoting *Hunter v. Pittsburgh,* 207 U.S. 161, 178, 28

1. In a letter sent to the Chairman of the Senate Commerce Committee before enactment of the legislation, the General Counsel of the Treasury Department, Mr. Samuel Pierce, pointed out that this definition "would extend the coverage of the Act to a geographical area greater than that comprising the Customs territory of the United States...." S.Rep. No. 516, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 3993, 4092, 4129. Mr. Pierce recommended a definition confined to the several states, the District of Columbia, and Puerto Rico, but his recommendation was not adopted.

S.Ct. 40, 46, 52 L.Ed. 151 (1907)), *cert. denied*, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988). If the State of Michigan has retained the power to impose registration and notice requirements on commercial users of pesticides, therefore, one would normally assume that the state could authorize the exercise of that power through whatever political subdivision it wished.

It is undisputed that under the "home rule" provisions of the Michigan constitution, the Village of Milford has sweeping power to adopt ordinances relating to public health and other matters of municipal concern. See Mich. Const., Art. VII, § 22. When the predecessor of Michigan's current constitution was adopted in 1908, "very broad, general powers of government were consigned to those units of government likely to be best informed of local needs and best able to satisfy them...." *Dooley v. City of Detroit*, 370 Mich. 194, 121 N.W.2d 724, 730 (1963). That allocation of powers was continued when Michigan's current constitution was adopted in 1963—and villages were among the units of government to which very broad powers were assigned. Incorporated villages, the Michigan legislature has confirmed, possess the authority to pass such ordinances as they may deem proper to "preserve the public health," among other things, and to "make such other regulations for the safety and good government of the village and the general welfare of its inhabitants as are not inconsistent with the general laws...." Mich.Comp.Laws § 67.1. See also Michigan's "Village Home Rule Act," Mich.Comp.Laws §§ 78.1 *et seq.*

Because the State of Michigan has thus clearly authorized ordinances such as that enacted by the Village of Milford, there is a very real sense in which the Milford ordinance represents "state" action within the territorial limits of the village. The results of this state action are no different in kind from those that would have been produced had Michigan chosen to regulate pesticide usage in the village through a statute passed directly by the legislature and signed by the governor. It is true that municipalities are not specifically mentioned in the definition section of the Pesticide Control Act, but state governors and state legislatures are not specifically mentioned in that section either.

There are three sections of the Pesticide Control Act in which Congress did refer specifically to political subdivisions or local agencies. It has been argued, therefore, that "when Congress intended that local governments play a role in [the Act's] regulatory scheme, it specifically said so." *Maryland Pest Control Ass'n v. Montgomery County*, 646 F.Supp. 109, 111 (D.Md.1986) (quoting 70 Ops.Atty.Gen. Md. 161 (1985)), *aff'd*, 822 F.2d 55 (4th Cir.1987) (unpublished op.). The argument, it seems to me, is not persuasive.

The first section of the Act to refer specifically to political subdivisions is § 8 (7 U.S.C. § 136f), which deals with the maintenance and inspection of books and records. Section 8(a) authorizes the Administrator of the Environmental Protection Agency to require pesticide manufacturers to maintain records of their operations, and § 8(b) says that manufacturers shall produce such records for inspection "upon request of any officer or employee of the Environmental Protection Agency *or of any State or political subdivision, duly designated by the Administrator* ...." 7 U.S.C. § 136f(b) (emphasis supplied). The authority of the EPA Administrator to designate such officials is conferred by § 23(a) of the Act, which authorizes the Administrator to enter into cooperative agreements with "States" to "delegate to any *State* the authority to cooperate in the enforcement of the Act through the use of *its* personnel...." 7 U.S.C. § 136u(a) (emphasis supplied).[2] Section 23 of the Act necessarily uses the word "State" to include political subdivisions, for it would not otherwise be appropriate to speak of political subdivisions in § 8. And if "State" includes political subdivisions in § 23 of the Act, it can

---

**2.** This section was amended in 1978 to include Indian tribes as well as states. Pub.L. No. 95– 396, § 21, 92 Stat. 834 (1978).

hardly be a forgone conclusion that "State" does not include political subdivisions in § 24 of the Act as well.

The next section of the Act to refer specifically to political subdivisions is § 20 (7 U.S.C. § 136r), which mandates cooperation with local agencies in connection with research and monitoring. Section 20(b) directs the Administrator to formulate a national plan, "in connection with other Federal, State or local agencies," for monitoring pesticides. Section 20(c) directs the Administrator to undertake monitoring activities, again in cooperation with other federal, state or local agencies.

Section 22(b), finally, contains a more generalized directive for the Administrator to cooperate with local agencies, *inter alia*:

> "The Administrator shall cooperate with the Department of Agriculture, any other Federal agency, and any appropriate agency of any State or any political subdivision thereof, in carrying out the provisions of this Act, and in securing uniformity of regulations." 7 U.S.C. § 136t(b).

These statutory directives for the Administrator to cooperate with appropriate local officials and political subdivisions shed little or no light on the question whether pesticides may be regulated by local ordinance. A mandate for the Administrator to cooperate with political subdivisions is certainly no less consistent with the conclusion that states may confer a regulatory role on their political subdivisions than it is with the conclusion that they may not.

## II

If the Act itself does not plainly show that Congress intended to preclude states from regulating through their political subdivisions, the amendments, committee reports and floor debates comprising the legislative history of the enactment demonstrate almost conclusively, I believe, that those who were most knowledgeable about this piece of legislation, and who had the greatest responsibility for shaping its terms, understood that it was designated to do precisely that. Most Members of Congress, to be sure, probably never focused on the issue at all. The Members on whom the rank and file were relying to hammer out an acceptable bill did focus on the issue, however, and evidently made a conscious decision that regulation by political subdivisions should be preempted. That decision was not solely the work of anonymous staffers, and it was not slipped into the legislative history at the last minute— or, as sometimes happens, after the last minute. The decision was made well in advance of enactment of the legislation, it was known to and accepted by the members of the responsible committees, and it was openly explained prior to enactment.

President Nixon's original proposal for the legislation that became the 1972 Pesticide Control Act said explicitly that "nothing in this Act shall be construed as limiting the authority of a State *or a political subdivision thereof* to regulate the sale or use of a pesticide within its jurisdiction insofar as such regulation does not permit such sale or use as is prohibited under authority of the Act." H.R. 4152, 92d Cong., 1st Sess. § 19(c)c (1971), as quoted in *Maryland Pest Control Ass'n*, 646 F.Supp. at 111–12. (Emphasis supplied.) The House Agriculture Committee, which was the first committee to report the legislation out, not only deleted this reference to political subdivisions,[3] but would also have prohibited the states themselves from restricting the use of any pesticide that the Administrator of the EPA had registered with a "general use" classification:

> "A State may regulate the sale or use of any pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this Act *or restrict by license or permit the use of a pesticide registered for general use.*" § 24(a) of H.R. 10729,

---

3. The accompanying report explained that "The Committee rejected a proposal which would have permitted political subdivisions to further regulate pesticides on the grounds that the 50 States and the Federal Government should provide an adequate number of regulatory jurisdictions." H.R.Rep. No. 511, 92d Cong., 1st Sess. 16 (1971).

92d Cong., 1st Sess., 117 Cong.Rec. 40,-027 (1971). (Emphasis supplied.)

In the ensuing debate on the House floor, Congressman Dow offered a substitute bill containing six amendments, the last of which dealt with § 24(a). Congressman Dow did not propose to restore the language authorizing regulation by political subdivisions; he simply proposed striking the prohibition against states going further than the federal government in restricting pesticides registered for general use. 117 Cong.Rec. 40,034 (1971). Mr. Dow noted that state officials from ten states, including Michigan, had expressed "opposition to the preemption of State authority authorized by section 24." *Id.* at 40,035. No such opposition was noted with regard to the change the Agriculture Committee had made concerning political subdivisions.

The Dow substitute was ultimately defeated, but on motion of Congressman Kyl, and with the support of Chairman Poage of the Agriculture Committee, § 24(a) was amended on the House floor to drop the restriction to which Congressman Dow and others had objected. *Id.* at 40,065. The amended version of that bill—which reflected a number of changes made in committee, as well as the one change made on the House floor—was hailed as "the compromise product of environmentalists, farm groups, State and Federal officials, the chemical industry, and the public." *Id.,* remarks of Congressman Sebelius.

On the Senate side the legislation was considered first by the Committee of Agriculture and Forestry and then by the Commerce Committee. 118 Cong.Rec. 32,251 (1972). Under date of June 7, 1972, the former committee issued a report containing this highly instructive passage:

> *"The Senate Committee considered the decision of the House Committee to deprive political subdivisions of States and other local authorities of any authority or jurisdiction over pesticides and concurs with the decision of the House of Representatives.* Clearly, the fifty States and the Federal Government provide sufficient jurisdictions to proper-

ly regulate pesticides. Moreover, few, if any, local authorities whether towns, counties, villages, or municipalities have the financial wherewithal to provide necessary expert regulation comparable with that provided by the State and Federal Governments. On this basis and on the basis that permitting such regulation would be an extreme burden on interstate commerce, *it is the intent that section 24, by not providing any authority to political subdivisions and other local authorities of or in the States, should be understood as depriving such local authorities and political subdivisions of any and all jurisdiction and authority over pesticides and the regulation of pesticides."* S.Rep. No. 838, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 3993, 4008. (Emphasis supplied.)

The Senate Commerce Committee disagreed with the Agriculture Committee on this and a number of other issues. The Commerce Committee adopted 15 sets of amendments to the Agriculture Committee's version of the bill, one of which (Amendment No. 10) was explained thus in a report issued by the Commerce Committee under date of July 19, 1972:

> *"Authority of Local Governments to Regulate the Use of Pesticides*

> The amendment gives local governments the authority to regulate the sale or use of a pesticide beyond the requirements imposed by State and Federal authorities.

> While the Agriculture Committee bill does not specifically prohibit local governments from regulating pesticides, the report of that committee states explicitly that local governments cannot regulate pesticides in any manner. Many local governments now regulate pesticides to meet their own specific needs which they are often better able to perceive than are State and Federal regulators. The amendment of the Committee on Commerce is intended to continue the authority of such local governments and allow then to protect their environ-

ment to a greater degree than would EPA.

The amended language would prohibit local governments from imposing requirements as to labeling and packaging which differ from those imposed by Federal and State authorities. Localities would therefore be preempted from regulating the composition of any pesticide. Local governments could, however, prohibit or restrict the sale or use of pesticides within their jurisdiction. As manufacturers will not be forced to formulate different variations of the same pesticide to meet local needs, no unreasonable burdens on commerce are anticipated. Nor are burdens on the environment, since localities could not permit sales or uses prohibited by State and Federal authorities." S.Rep.No. 970, 92d Cong., 2d Sess., *reprinted in* 1972 U.S. Code Cong. & Admin. News 4092, 4111–12.

After issuance of this report, the two committees and their staffs engaged in extensive negotiations and ultimately worked out a compromise bill. 118 Cong.Rec. 32,-251 (1972). The compromise—which was supported by all of the members of the Agriculture Committee and a majority of the members of the Commerce Committee, including Senator Hart of Michigan, *id.* at 32,252—incorporated nine of the Commerce Committee changes, with modifications, but did not include Amendment No. 10. An explanation of the compromise printed in the Congressional Record for September 26, 1972, described the amendments that had been adopted and noted that "Commerce Committee amendments ... 10 (authority of local governments to regulate the use of pesticides) ... are not included in the substitute." *Id.* at 32,258.

Senator Hart inserted a statement in the record supporting the compromise. *Id.* at 32,258. Several of Senator Hart's colleagues took note of the long hours he personally had spent on the legislation. *Id.* at 32,259–60.

Senator Allen, the Agriculture subcommittee chairman responsible for the management of the bill on the floor, ex-

pressed himself on the compromise as follows:

"The package of amendments now before us reflect a reasonable compromise agreement between the Agriculture Committee and the Commerce Committee. Each participant in this agreement may have some reservations about particular provisions that have been added or about particular provisions that have been deleted.

No one should have any doubt, however, that this agreement marks a major and significant improvement over present authority to control pesticides. No one should have any doubts about the concern for environmental quality which is expressed in this bill with the addition of the Agriculture/Commerce package of amendments." *Id.* at 32,260.

The Senate passed the compromise by a vote of 71 to 0. *Id.* at 32,263. Section 24 was exactly the same in both the Senate and House bills, and no changes were made in that section when the bills went to the conference committee. The conference report was passed by both houses without further discussion of the regulatory authority of local governments. The view of the House and Senate Agriculture Committees on that issue prevailed, and the view of the administration and the Senate Commerce Committee did not.

The appellants in this case argue that because the dispute over preemption of local regulatory authority was compromised by not specifically referring to this subject in the statute, the compromise was not designed to preempt traditional local police powers or to preempt the power of a state to distribute its regulatory authority between itself and its political subdivisions in any way it might see fit. (See *People ex rel. Deukmejian v. County of Mendocino*, 36 Cal.3d 476, 683 P.2d 1150, 1160–61, 204 Cal.Rptr. 897, 907–08 (1984), for a succinct statement of this position.) The argument might have been persuasive if the compromise had been limited to the local government issue, but such was not the case. There were numerous points of disagreement between the Senate committees, for

example, and the compromise reached in the Senate was based on the Agriculture Committee's receding on some issues and the Commerce Committee's receding on others. The local government question was one on which the Commerce Committee gave way to the Agriculture Committee entirely, and when the Senate passed the compromise bill, it passed a bill that the Commerce Committee had said, in its June 7 report, "should be understood as depriving ... local authorities and political subdivisions of any and all jurisdiction and authority over pesticides and the regulation of pesticides."

When the House passed its version of the legislation, similarly, it adopted a compromise in which language preserving local regulatory authority had been deleted, as had language curtailing the regulatory authority of the states *qua* states with respect to general use pesticides. The House Agriculture Committee's announced intention in deleting the local government language was to limit the number of "regulatory jurisdictions" to "the 50 States [plus Puerto Rico, etc.] and the Federal Government." It was the House Committee's version that the Senate ultimately adopted, and the report of the Senate Agriculture Committee specifically endorsed "the decision of the House Committee to deprive political subdivisions of States and other local authorities of any authority or jurisdiction over pesticides...." As Judge Motz observed in *Maryland Pest Control,* 646 F.Supp. at 111, "the legislative history could not be more clear."

### III

But no matter how clear the legislative history may be, legislative history, as such, is not statutory law. "While we have frequently said that pre-emption analysis requires ascertaining congressional intent," the Supreme Court has noted, "... we have never meant that to signify Congressional intent in a vacuum, unrelated to the giving of meaning to an enacted statutory text." *Puerto Rico Dept. of Consumers Affairs v. Isla Petroleum Corp.,* 485 U.S. 495, 501, 108 S.Ct. 1350, 1354, 99 L.Ed.2d 582 (1988). "[L]egislative intention, without more, is not legislation." *Train v. City of New York,* 420 U.S. 35, 45, 95 S.Ct. 839, 845, 43 L.Ed.2d 1 (1975).

The Constitution itself shows that committee reports and other such indicia of Congressional intent must not be allowed to supplant the text of the statute. To become law, after all, a bill must have passed the House of Representatives as a whole, and not merely one or more House committees. U.S. Const., Art. I, § 7. It must have passed the Senate as a whole, and not merely one or more Senate committees. And "before it becomes a Law," a bill which has passed both the House and the Senate "shall be presented to the President of the United States." *Id.* The President may then veto the bill, in which case, unless each House overrides the veto by two-thirds vote, the bill "shall not be a Law." *Id.* Be it ever so clear, therefore, a committee report that has not passed both the House and the Senate and that has not been presented to the President cannot possibly be a "Law" within the meaning of the Constitution.

Still, the Supreme Court has long acknowledged that "[r]eports to Congress accompanying the introduction of proposed law may aid the courts in reaching the true meaning of the legislature in cases of doubtful interpretation." *Caminetti v. United States,* 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917). We are bound by the text of the statute, and where the proper interpretation of the enacted statutory text is "doubtful," resort to *bona fide* legislative history is always permissible and may sometimes be helpful.

What of the statute before us here; is its interpretation really doubtful? Doubtful enough, in my view.

The district court evidently believed that the system of pesticide regulation adopted in the Pesticide Control Act was so comprehensive that courts would have treated the entire field as having been occupied by the federal government absent the express disclaimer contained in § 24 of the Act. I am inclined to agree. Unless the affirmative grant of permission for "a State" to regu-

late pesticide use is properly interpreted as extending in one way or another to political subdivisions, then, political subdivisions may not enter the field—and although the term "State" ordinarily includes political subdivisions, there are times when it does not.

One need look no further than the Eleventh and Fourteenth Amendments to the Constitution to find radically different usages of the term. As used in the Fourteenth Amendment, a "State" includes political subdivisions. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 173, 90 S.Ct. 1598, 1616–17, 26 L.Ed.2d 142 (1970). As used in the Eleventh Amendment, a "State" does not include political subdivisions. *Mt. Healthy City Board of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977). In which sense was the term used in §§ 24 and 2(aa) of the Pesticide Control Act? I cannot say the issue is not "doubtful," even though the legislative history points to an answer that I would not have given had there been no such history. Although I consider this a close case, therefore, I agree that the district court reached the correct result.