WISCONSIN PUBLIC INTERVENOR ET AL. *v.*
MORTIER ET AL.

No. 89–1905.   Argued April 24, 1991—Decided June 21, 1991

598

*Thomas J. Dawson,* Assistant Attorney General of Wisconsin, argued the cause for petitioners. With him on the briefs was *Linda K. Monroe.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Stewart, Clifford M. Sloan,* and *David C. Shilton.*

*Paul G. Kent* argued the cause for respondents. With him on the brief was *Richard J. Lewandowski.**

JUSTICE WHITE delivered the opinion of the Court.

This case requires us to consider whether the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA or Act), 61 Stat. 163, as amended, 7 U. S. C. § 136 *et seq.*, pre-empts the regulation of pesticides by local governments. We hold that it does not.

---

*Briefs of *amici curiae* urging reversal were filed for the State of Hawaii et al. by *Warren Price III*, Attorney General of Hawaii, and *Girard D. Lau* and *Steven S. Michaels*, Deputy Attorneys General, *James H. Evans*, Attorney General of Alabama, *Roland W. Burris*, Attorney General of Illinois, *Robert T. Stephan*, Attorney General of Kansas, *Michael E. Carpenter*, Attorney General of Maine, *Frank J. Kelley*, Attorney General of Michigan, *William L. Webster*, Attorney General of Missouri, *Frankie Sue Del Papa*, Attorney General of Nevada, *Ernest Preate, Jr.*, Attorney General of Pennsylvania, *Paul Van Dam*, Attorney General of Utah, and *Jeffrey L. Amestoy*, Attorney General of Vermont; for the Conservation Law Foundation of New England, Inc., et al. by *E. Susan Garsh, Robert E. McDonnell*, and *Maris L. Abbene;* for the National Institute of Municipal Law Officers et al. by *Robert J. Alfton, William I. Thornton, Jr.*, and *Analeslie Muncy;* for the Village of Milford, Michigan, et al. by *Patti A. Goldman, Alan B. Morrison*, and *Brian Wolfman*.

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Daniel E. Lungren*, Attorney General of California, *Roderick E. Walston*, Chief Assistant Attorney General, *R. H. Connett*, Assistant Attorney General, and *Charles W. Getz III*, Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Linley E. Pearson* of Indiana, *J. Joseph Curran, Jr.*, of Maryland, *Robert J. Del Tufo* of New Jersey, and *Kenneth O. Eikenberry* of Washington; for the American Association of Nurserymen et al. by *Frederick A. Provorny* and *Robert A. Kirshner;* for the American Farm Bureau Federation by *John J. Rademacher* and *Richard L. Krause;* for the Green Industry Council by *Stephen S. Ostrach;* for the Professional Lawn Care Association of America by *Joseph D. Lonardo;* for the National Pest Control Association et al. by *Lawrence S. Ebner;* and for the Washington Legal Foundation by *Daniel J. Popeo, Paul D. Kamenar,* and *John C. Scully.*

I

A

FIFRA was enacted in 1947 to replace the Federal Government's first effort at pesticide regulation, the Insecticide Act of 1910, 36 Stat. 331. 61 Stat. 163. Like its predecessor, FIFRA as originally adopted "was primarily a licensing and labeling statute." *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 991 (1984). In 1972, growing environmental and safety concerns led Congress to undertake a comprehensive revision of FIFRA through the Federal Environmental Pesticide Control Act. 86 Stat. 973. The 1972 amendments significantly strengthened FIFRA's registration and labeling standards. 7 U. S. C. § 136a. To help make certain that pesticides would be applied in accordance with these standards, the revisions further insured that FIFRA "regulated the use, as well as the sale and labeling, of pesticides; regulated pesticides produced and sold in both intrastate and interstate commerce; [and] provided for review, cancellation, and suspension of registration." *Ruckelshaus*, *supra*, at 991–992. An additional change was the grant of increased enforcement authority to the Environmental Protection Agency (EPA), which had been charged with federal oversight of pesticides since 1970. See Reorganization Plan No. 3 of 1970, 35 Fed. Reg. 15623 (1970), 5 U. S. C. App., p. 1343. In this fashion, the 1972 amendments "transformed FIFRA from a labeling law into a comprehensive regulatory statute." 467 U. S., at 991.

As amended, FIFRA specifies several roles for state and local authorities. The statute, for example, authorizes the EPA Administrator to enter into cooperative agreements with the States to enforce FIFRA provisions. 7 U. S. C. §§ 136u, 136w–1. As part of the enforcement scheme, FIFRA requires manufacturers to produce records for inspection "upon request of any officer or employee of the Environmental Protection Agency or of any State or political subdivision, duly designated by the Administrator." § 136f(b).

FIFRA further directs the EPA Administrator to cooperate with "any appropriate agency of any State or any political subdivision thereof." § 136t(b). Of particular relevance to this case, § 24(a) specifies that States may regulate the sale or use of pesticides so long as the state regulation does not permit a sale or use prohibited by the Act. § 136v(a).

B

Petitioner, the town of Casey, is a small rural community located in Washburn County, Wisconsin, several miles northwest of Spooner, on the road to Superior.[1] In 1985, the town adopted Ordinance 85–1, which regulates the use of pesticides. The ordinance expressly borrows statutory definitions from both Wisconsin laws and FIFRA, and was enacted under Wis. Stat. §§ 61.34(1), (5) (1989–1990), which accord village boards general police, health, and taxing powers.[2]

The ordinance requires a permit for the application of any pesticide to public lands, to private lands subject to public

---

[1] The town has a population of from 400 to 500 persons, large enough to enact the ordinance at issue in this case. See Washburn County Directory 1982–83, cited in Brief for Respondents 4, n. 4; Tr. of Oral Arg. 12.

[2] Section 61.34(1) provides:

"Except as otherwise provided by law, the village board shall have the management and control of the village property, finances, highways, streets, navigable waters, and the public service, and shall have power to act for the government and good order of the village, for its commercial benefit and for the health, safety, welfare and convenience of the public, and may carry its powers into effect by license, regulation, suppression, borrowing, taxation, special assessment, appropriation, fine, imprisonment, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants and shall be limited only by express language."

Section 61.34(5) provides:

"For the purpose of giving to villages the largest measure of self-government in accordance with the spirit of article XI, section 3, of the [Wisconsin] constitution it is hereby declared that this chapter shall be liberally construed in favor of the rights, powers and privileges of villages to promote the general welfare, peace, good order and prosperity of such villages and the inhabitants thereof."

use, or for the aerial application of any pesticide to private lands. § 1.2, 2 App. to Pet. for Cert. 6. A permit applicant must file a form including information about the proposed pesticide use not less than 60 days before the desired use. § 1.3(2), *id.*, at 7. The town board may "deny the permit, grant the permit, or grant the permit with . . . any reasonable conditions on a permitted application related to the protection of the health, safety and welfare of the residents of the Town of Casey." § 1.3(3), *id.*, at 11–12. After an initial decision, the applicant or any town resident may obtain a hearing to provide additional information regarding the proposed application. §§ 1.3(4), (5), *id.*, at 12–14. When a permit is granted, or granted with conditions, the ordinance further requires the permittee to post placards giving notice of the pesticide use and of any label information prescribing a safe reentry time. § 1.3(7), *id.*, at 14–16. Persons found guilty of violating the ordinance are subject to fines of up to $5,000 for each violation. § 1.3(7)(c), *id.*, at 16.

Respondent Ralph Mortier applied for a permit for aerial spraying of a portion of his land. The town granted him a permit, but precluded any aerial spraying and restricted the lands on which ground spraying would be allowed. Mortier, in conjunction with respondent Wisconsin Forestry/Rights-of-Way/Turf Coalition,[3] brought a declaratory judgment action in the Circuit Court for Washburn County against the town of Casey and named board members, claiming that the town of Casey's ordinance is pre-empted by state and federal law. The Wisconsin Public Intervenor, an assistant attorney general charged under state law with the protection of environmental public rights, Wis. Stat. §§ 165.07, 165.075 (1989–1990), was admitted without objection as a party defendant. On cross-motions for summary judgment, the Circuit Court ruled in favor of Mortier, holding that the town's

---

[3] The coalition is an unincorporated, nonprofit association of individual businesses and other associations whose members use pesticides.

ordinance was pre-empted both by FIFRA and by state statute, §§ 94.67–94.71; 2 App. to Pet. for Cert. 14.

The Supreme Court of Wisconsin affirmed in a 4-to-3 decision. *Mortier* v. *Casey*, 154 Wis. 2d 18, 452 N. W. 2d 555 (1990). Declining to address the issue of state-law preemption, the court concluded that FIFRA pre-empted the town of Casey's ordinance because the statute's text and legislative history demonstrated a clearly manifest congressional intent to prohibit "any regulation of pesticides by local units of government." *Id.*, at 20, n. 2, and 30, 452 N. W. 2d, at 555, n. 2, and 560. The court's decision accorded with the judgments of two Federal Courts of Appeals. *Professional Lawn Care Association* v. *Milford*, 909 F. 2d 929 (CA6 1990); *Maryland Pest Control Association* v. *Montgomery County*, 822 F. 2d 55 (CA4 1987), summarily aff'g 646 F. Supp. 109 (Md. 1986). Two separate dissents concluded that neither FIFRA's language nor its legislative history expressed an intent to pre-empt local regulation. *Casey, supra,* at 33, 452 N. W. 2d, at 561 (Abrahamson, J., dissenting); 154 Wis. 2d, at 45, 452 N. W. 2d, at 566 (Steinmetz, J., dissenting). The dissenters' conclusion in part relied on decisions reached by two State Supreme Courts. *Central Maine Power Co.* v. *Lebanon*, 571 A. 2d 1189 (Me. 1990); *People ex rel. Deukmejian* v. *County of Mendocino*, 36 Cal. 3d 476, 683 P. 2d 1150 (1984). Given the importance of the issue and the conflict of authority, we granted certiorari. 498 U. S. 1045 (1991). We now reverse.

II

Under the Supremacy Clause, U. S. Const., Art. VI, cl. 2, state laws that "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution" are invalid. *Gibbons* v. *Ogden*, 9 Wheat. 1, 211 (1824) (Marshall, C. J.). The ways in which federal law may pre-empt state law are well established and in the first instance turn on congressional intent. *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133 (1990). Congress' intent to supplant state authority in a

particular field may be express in the terms of the statute. *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977). Absent explicit pre-emptive language, Congress' intent to supersede state law in a given area may nonetheless be implicit if a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," if "the Act of Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or if the goals "sought to be obtained" and the "obligations imposed" reveal a purpose to preclude state authority. *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). See *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 203–204 (1983). When considering pre-emption, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice, supra,* at 230.

Even when Congress has not chosen to occupy a particular field, pre-emption may occur to the extent that state and federal law actually conflict. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines* v. *Davidowitz*, 312 U. S. 52 (1941).

It is, finally, axiomatic that "for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 713 (1985). See, *e. g., City of Burbank* v. *Lockheed Air Terminal, Inc.*, 411 U. S. 624 (1973).

## III

Applying these principles, we conclude that FIFRA does not pre-empt the town's ordinance either explicitly or implicitly or by virtue of an actual conflict.

### A

As the Wisconsin Supreme Court recognized, FIFRA nowhere expressly supersedes local regulation of pesticide use. The court, however, purported to find statutory language "which is indicative" of pre-emptive intent in the statute's provision delineating the "Authority of States." 7 U. S. C. § 136v. The key portions of that provision state:

"(a) . . . A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

"(b) . . . Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."

Also significant, in the court's eyes, was FIFRA's failure to specify political subdivisions in defining "State" as "a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa." § 136(aa).

It was not clear to the State Supreme Court, however, "that the statutory language [§§ 136v and 136(aa)] alone evince[d] congress' manifest intent to deprive political subdivisions of authority to regulate pesticides." *Casey*, 154 Wis. 2d, at 25, 452 N. W. 2d, at 557–558. It was nevertheless "possible" to infer from the statutory language alone that pesticide regulation by local entities was pre-empted; and when coupled with its legislative history, that language "unmistakably demonstrates the intent of Congress to pre-empt local ordinances such as that adopted by the Town of Casey." *Id.*, at 28, 452 N. W. 2d, at 559. The court's holding thus

rested on both §§ 136v and 136(aa) and their legislative history; neither the language nor the legislative history would have sufficed alone. There was no suggestion that absent the two critical sections, FIFRA was a sufficiently comprehensive statute to justify an inference that Congress had occupied the field to the exclusion of the States. Nor have the respondents argued in this Court to that effect. On the other hand, it is sufficiently clear that under the opinion announced by the court below, the State would have been precluded from permitting local authorities to regulate pesticides.

We agree that neither the language of the statute nor its legislative history, standing alone, would suffice to pre-empt local regulation. But it is also our view that, even when considered together, the language and the legislative materials relied on below are insufficient to demonstrate the necessary congressional intent to pre-empt. As for the statutory language, it is wholly inadequate to convey an express pre-emptive intent on its own. Section 136v plainly authorizes the "States" to regulate pesticides and just as plainly is silent with reference to local governments. Mere silence, in this context, cannot suffice to establish a "clear and manifest purpose" to pre-empt local authority. *Rice, supra,* at 230. Even if FIFRA's express grant of regulatory authority to the States could not be read as applying to municipalities, it would not follow that municipalities were left with no regulatory authority. Rather, it would mean that localities could not claim the regulatory authority explicitly conferred upon the States that might otherwise have been pre-empted through actual conflicts with federal law. At a minimum, localities would still be free to regulate subject to the usual principles of pre-emption.

Properly read, the statutory language tilts in favor of local regulation. The principle is well settled that local "'governmental units are "created as convenient agencies for exercising such of the governmental powers of the State as may be

entrusted to them" . . . in [its] absolute discretion.'" *Sailors* v. *Board of Ed. of Kent Cty.*, 387 U. S. 105, 108 (1967), quoting *Reynolds* v. *Sims*, 377 U. S. 533, 575 (1964), quoting *Hunter* v. *Pittsburgh*, 207 U. S. 161, 178 (1907). The exclusion of political subdivisions cannot be inferred from the express authorization to the "State[s]" because political subdivisions are components of the very entity the statute empowers. Indeed, the more plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the "absolute discretion" of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities.

Certainly no other textual basis for pre-emption exists. Mortier, building upon the decision below, contends that other provisions show that Congress made a clear distinction between nonregulatory authority, which it delegated to the States or their political subdivisions, and regulatory authority, which it expressly delegated to the "State[s]" alone. The provisions on which he relies, however, undercut his contention. Section 136t(b), for example, mandates that the EPA Administrator cooperate with "any appropriate agency of any State or any political subdivision thereof, in carrying out the provisions of this subchapter." As an initial matter, the section does not limit "the provisions of the subchapter" which localities are authorized to carry out to "nonregulatory" provisions. Moreover, to read this provision as pre-empting localities would also require the anomalous result of pre-empting the actions of any agency to the extent it exercised state-delegated powers that included pesticide regulation. Likewise, § 136f(b) requires manufacturers to produce records for the inspection upon the request of any employee of the EPA "or of any State or political subdivision, duly designated by the Administrator." Section 136u(a)(1), however, authorizes the Administrator to "delegate to any State . . . the authority to cooperate in the enforcement of this [Act] through the use of its personnel." If the use of "State"

in FIFRA impliedly excludes subdivisions, it is unclear why the one provision would allow the designation of local officials for enforcement purposes while the other would prohibit local enforcement authority altogether.

Mortier, like the court below and other courts that have found pre-emption, attempts to compensate for the statute's textual inadequacies by stressing the legislative history. *Casey*, 154 Wis. 2d, at 25–28, 452 N. W. 2d, at 558–559; *Professional Lawn Care Association*, 909 F. 2d, at 933–934. The evidence from this source, which centers on the meaning of what would become § 136v, is at best ambiguous. The House Agriculture Committee Report accompanying the proposed FIFRA amendments stated that it had "rejected a proposal which would have permitted political subdivisions to further regulate pesticides on the grounds that the 50 States and the Federal Government should provide an adequate number of regulatory jurisdictions." H. R. Rep. No. 92–511, p. 16 (1971). While this statement indicates an unwillingness by Congress to grant political subdivisions regulatory authority, it does not demonstrate an intent to prevent the States from delegating such authority to its subdivisions, and still less does it show a desire to prohibit local regulation altogether. At least one other statement, however, concededly goes further. The Senate Committee on Agriculture and Forestry Report states outright that it "considered the decision of the House Committee to deprive political subdivisions of States and other local authorities of any authority or jurisdiction over pesticides and concurs with the decision of the House of Representatives." S. Rep. No. 92–838, p. 16 (1972).

But other Members of Congress clearly disagreed. The Senate Commerce Committee, which also had jurisdiction over the bill, observed that "[w]hile the [Senate] Agriculture Committee bill does not specifically prohibit local governments from regulating pesticides, the report of that committee states explicitly that local governments cannot regulate

pesticides in any manner. Many local governments now regulate pesticides to meet their own specific needs which they are often better able to perceive than are State and Federal regulators." S. Rep. No. 92–970, p. 27 (1972). To counter the language in the Agriculture and Forestry Committee Report, the Commerce Committee proposed an amendment expressly authorizing local regulation among numerous other, unrelated proposals. This amendment was rejected after negotiations between the two Committees. See 118 Cong. Rec. 32251 (1972); H. R. Conf. Rep. No. 92–1540, p. 33 (1972).

As a result, matters were left with the two principal Committees responsible for the bill in disagreement over whether it pre-empted pesticide regulation by political subdivisions. It is important to note, moreover, that even this disagreement was confined to the pre-emptive effect of FIFRA's authorization of regulatory power to the States in § 136v. None of the Committees mentioned asserted that FIFRA pre-empted the field of pesticide regulation. Like FIFRA's text, the legislative history thus falls far short of establishing that pre-emption of local pesticide regulation was the "clear and manifest purpose of Congress." *Rice*, 331 U. S., at 230. We thus agree with the submission in the *amicus* brief of the United States expressing the views of the EPA, the agency charged with enforcing FIFRA.[4]

---

[4] JUSTICE SCALIA's foray into legislative history runs into several problems. For one, his concurrence argues that the House Agriculture Committee made it clear that it wanted localities "out of the picture" because its Report specifies as grounds for rejecting a proposal *permitting* the localities to regulate pesticides the observation that the Federal Government and the 50 States provided an adequate number of regulatory jurisdictions. *Post*, at 617. But the only way to infer that the Committee opposed not only a direct grant of regulatory authority upon localities but also state delegation of authority to regulate would be to suppose that the term "regulatory jurisdictions" meant regulatory for the purposes of exercising any authority at all as opposed to exercising authority derived from a direct

## B

Likewise, FIFRA fails to provide any clear and manifest indication that Congress sought to supplant local authority

---

federal grant.   H. R. Rep. No. 92–511, p. 16 (1971).   The language of the Report does not answer this question one way or another.

The concurrence further contends that the Senate Agriculture Committee unequivocally expressed its view that § 136v should be read to deprive localities of regulatory authority over pesticide.   This may be true, but it is hardly dispositive.   Even if § 136v were sufficiently ambiguous to justify reliance on legislative history, the meaning a committee puts forward must at a minimum be within the realm of meanings that the provision, fairly read, could bear.   Here the Report clearly states that § 136v should be read as a prohibition, but it is just as clear that the provision is written exclusively in terms of a grant.   No matter how clearly its report purports to do so, a committee of Congress cannot take language that could only cover "flies" or "mosquitoes," and tell the courts that it really covers "ducks."

Finally, the concurrence suggests that the Senate Commerce Committee Report reconfirmed the views of the two Agriculture Committees that § 136v prohibited local pesticide regulation.   *Post*, at 618–620.   But the Commerce Committee at no point states, clearly or otherwise, that it *agrees* that the section before it does this.   Rather, the Report states that "[w]hile the Agriculture Committee *bill* does not specifically prohibit local governments from regulating pesticides, *the report of that committee* states explicitly that local governments cannot regulate pesticides in any manner."   S. Rep. No. 92–970, p. 27 (1972) (emphasis added).   The Commerce Committee, indeed, went on to assert its policy differences with its Agriculture counterpart.   It did this by attempting to strike at the root of the problem through changing the language of the provision itself.   Far from showing agreement with its rival, the Commerce Committee's words and actions show a body that, first, conceded *no* ground on the meaning of the disputed language and then, second, raised the stakes by seeking to insure that the language could go only *its* way.   On both the existence and the desirability of a prohibition on local regulation, there can be no doubt that the Commerce and Agriculture Committees stood on the opposite sides of the Senate debate.

As for the propriety of using legislative history at all, common sense suggests that inquiry benefits from reviewing additional information rather than ignoring it.   As Chief Justice Marshall put it, "[w]here the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived."   *United States* v. *Fisher*, 2 Cranch 358, 386

over pesticide regulation impliedly. In particular, we reject the position of some courts, but not the court below, that the 1972 amendments transformed FIFRA into a comprehensive statute that occupied the field of pesticide regulation, and that certain provisions opened specific portions of the field to state regulation and much smaller portions to local regulation. See *Professional Lawn Care*, 909 F. 2d, at 933–934; *Maryland Pest Control*, 646 F. Supp., at 110–111; see also Brief for National Pest Control Association et al. as *Amici Curiae* 6–16; Brief for Washington Legal Foundation as *Amicus Curiae* 5–18. On this assumption, it has been argued, § 136v(a) could be viewed as opening the field of general pesticide regulation to the States yet leaving it closed to political subdivisions.

This reasoning is unpersuasive. As an initial matter, it would still have to be shown under ordinary canons of construction that FIFRA's delegation of authority to "State[s]" would not therefore allow the States in turn to redelegate some of this authority to their political subdivisions either specifically or by leaving undisturbed their existing statutes that would otherwise provide local government with ample authority to regulate. We have already noted that § 136v(a) can be plausibly read to contemplate precisely such redelegation. The term "State" is not self-limiting since political subdivisions are merely subordinate components of the whole. The scattered mention of political subdivisions elsewhere in FIFRA does not require their exclusion here. The legislative history is complex and ambiguous.

More importantly, field pre-emption cannot be inferred. In the first place, § 136v itself undercuts such an inference.

---

(1805). Legislative history materials are not generally so misleading that jurists should never employ them in a good-faith effort to discern legislative intent. Our precedents demonstrate that the Court's practice of utilizing legislative history reaches well into its past. See, *e. g.*, *Wallace* v. *Parker*, 6 Pet. 680, 687–690 (1832). We suspect that the practice will likewise reach well into the future.

The provision immediately following the statute's grant of regulatory authority to the States declares that "[s]uch State shall not impose or continue in effect any requirements for labeling and packaging in addition to or different from those required under" FIFRA. § 136v(b). This language would be pure surplusage if Congress had intended to occupy the entire field of pesticide regulation. Taking such pre-emption as the premise, § 136v(a) would thus grant States the authority to regulate the "sale or use" of pesticides, while § 136v(b) would superfluously add that States did not have the authority to regulate "labeling or packaging," an addition that would have been doubly superfluous given FIFRA's historic focus on labeling to begin with. See *Monsanto*, 467 U. S., at 991.

Nor does FIFRA otherwise imply pre-emption. While the 1972 amendments turned FIFRA into a "comprehensive regulatory statute," *Monsanto*, *supra*, at 991, the resulting scheme was not "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice*, *supra*, at 230. To the contrary, the statute leaves ample room for States and localities to supplement federal efforts even absent the express regulatory authorization of § 136v(a). FIFRA addresses numerous aspects of pesticide control in considerable detail, in particular: registration and classification, § 136a; applicator certification, § 136b; inspection of pesticide production facilities, §§ 136e and 136g; and the possible ban and seizure of pesticides that are misbranded or otherwise fail to meet federal requirements, § 136k. These provisions reflect the general goal of the 1972 amendments to strengthen existing labeling requirements and ensure that these requirements were followed in practice. § 136k. See *Monsanto*, *supra*, at 991–992. FIFRA nonetheless leaves substantial portions of the field vacant, including the area at issue in this case. FIFRA nowhere seeks to establish an affirmative permit scheme for the actual use of pesticides. It certainly does not equate reg-

istration and labeling requirements with a general approval to apply pesticides throughout the Nation without regard to regional and local factors like climate, population, geography, and water supply. Whatever else FIFRA may supplant, it does not occupy the field of pesticide regulation in general or the area of local use permitting in particular.

In contrast to other implicitly pre-empted fields, the 1972 enhancement of FIFRA does not mean that the use of pesticides can occur "'only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands.'" *City of Burbank* v. *Lockheed Air Terminal, Inc.*, 411 U. S., at 634, quoting *Northwest Airlines* v. *Minnesota*, 322 U. S. 292, 303 (1944) (Jackson, J., concurring). The specific grant of authority in § 136v(a) consequently does not serve to hand back to the States powers that the statute had impliedly usurped. Rather, it acts to ensure that the States could continue to regulate use and sales even where, such as with regard to the banning of mislabled products, a narrow pre-emptive overlap might occur. As noted in our discussion of express pre-emption, it is doubtful that Congress intended to exclude localities from the scope of § 136v(a)'s authorization, but however this may be, the type of local regulation at issue here would not fall within any impliedly pre-empted field.

## C

Finally, like the EPA, we discern no actual conflict either between FIFRA and the ordinance before us or between FIFRA and local regulation generally. Mortier does not rely, nor could he, on the theory that compliance with the ordinance and FIFRA is a "physical impossibility." *Florida Lime & Avocado Growers*, 373 U. S., at 142–143. Instead, he urges that the town's ordinance stands as an obstacle to the statute's goals of promoting pesticide regulation that is coordinated solely on the federal and state levels, that rests upon some degree of technical expertise, and that does not

unduly burden interstate commerce. Each one of these assertions rests on little more than snippets of legislative history and policy speculations. None of them is convincing.

To begin with, FIFRA does not suggest a goal of regulatory coordination that sweeps either as exclusively or as broadly as Mortier contends. The statute gives no indication that Congress was sufficiently concerned about this goal to require pre-emption of local use ordinances simply because they were enacted locally. Mortier suggests otherwise, quoting legislative history which states that FIFRA establishes "a coordinated Federal-State administrative system to carry out the new program," and raising the specter of gypsy moth hordes safely navigating through thousands of contradictory and ineffective municipal regulations. H. R. Rep. No. 92–511, at 1–2. As we have made plain, the statute does not expressly or impliedly preclude regulatory action by political subdivisions with regard to local use. To the contrary, FIFRA implies a regulatory partnership between federal, state, *and* local governments. Section 136t(b) expressly states that the Administrator "shall cooperate with . . . any appropriate agency of any State or any political subdivision thereof, in carrying out the provisions of this [Act] and in securing uniformity of regulations." Nor does FIFRA suggest that any goal of coordination precludes local use ordinances because they were enacted independently of specific state or federal oversight. As we have also made plain, local use permit regulations—unlike labeling or certification—do not fall within an area that FIFRA's "program" pre-empts or even plainly addresses. There is no indication that any coordination which the statute seeks to promote extends beyond the matters with which it deals, or does so strongly enough to compel the conclusion that an independently enacted ordinance that falls outside the statute's reach frustrates its purpose.

FIFRA provides even less indication that local ordinances must yield to statutory purposes of promoting technical

expertise or maintaining unfettered interstate commerce. Once more, isolated passages of legislative history that were themselves insufficient to establish a pre-emptive congressional intent do not by themselves establish legislative goals with pre-emptive effect. See, *e. g.*, S. Rep. No. 92–838, at 16. Mortier nonetheless asserts that local ordinances necessarily rest on insufficient expertise and burden commerce by allowing, among other things, large-scale crop infestation. As with the specter of the gypsy moth, Congress is free to find that local regulation does wreak such havoc and enact legislation with the purpose of preventing it. We are satisfied, however, that Congress has not done so yet.

## IV

We hold that FIFRA does not pre-empt the town of Casey's ordinance regulating the use of pesticides. The judgment of the Wisconsin Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court that FIFRA does not pre-empt local regulation, because I agree that the terms of the statute do not alone manifest a pre-emption of the entire field of pesticide regulation. *Ante,* at 611–614. If there *were* field pre-emption, 7 U. S. C. § 136v would be understood not as restricting certain types of state regulation (for which purpose it makes little sense to restrict States but not their subdivisions) but as *authorizing* certain types of state regulation (for which purpose it makes eminent sense to authorize States but not their subdivisions). But the field-pre-emption question is certainly a close one. Congress' selective use of "State" and "State and political subdivisions thereof" would suggest the authorizing rather than restricting meaning of § 136v, were it not for the inconsistent usage pointed to in Part I of the Court's opinion.

As the Court today recognizes, see *ante*, at 606–607, the Wisconsin justices agreed with me on this point, and would have come out the way that I and the Court do *but for* the Committee Reports contained in FIFRA's legislative history. I think they were entirely right about the tenor of those Reports. Their only mistake was failing to recognize how unreliable Committee Reports are—not only as a genuine indicator of congressional intent but as a safe predictor of judicial construction. We use them when it is convenient, and ignore them when it is not.

Consider how the case would have been resolved if the Committee Reports were taken seriously: The bill to amend FIFRA (H. R. 10729) was reported out of the House Committee on Agriculture on September 25, 1971. According to the accompanying Committee Report:

"The Committee rejected a proposal which would have permitted political subdivisions to further regulate pesticides on the grounds that the 50 States and the Federal Government should provide an adequate number of regulatory jurisdictions." H. R. Rep. No. 92–511, p. 16 (1971).

Had the *grounds* for the rejection not been specified, it would be possible to entertain the Court's speculation, *ante*, at 609, that the Committee might have been opposing only *direct* conferral upon localities of authority to regulate, in contrast to state *delegation* of authority to regulate. But once it is specified that an excessive number of regulatory jurisdictions is the problem—that "50 States and the Federal Government" are enough—then it becomes clear that the Committee wanted localities out of the picture, and thought that its bill placed them there.

The House Agriculture Committee's bill was passed by the full House on November 9, 1971, and upon transmittal to the Senate was referred to the Senate Committee on Agriculture and Forestry, which reported it out on June 7, 1972. The accompanying Committee Report both clearly confirms the

foregoing interpretation of the House Committee Report, and clearly endorses the disposition that interpretation produces.

> "[We have] considered the decision of the House Committee to deprive political subdivisions of States and other local authorities of any authority or jurisdiction over pesticides and concu[r] with the decision of the House of Representatives. Clearly, the fifty States and the Federal Government provide sufficient jurisdictions to properly regulate pesticides. Moreover, few, if any, local authorities whether towns, counties, villages, or municipalities have the financial wherewithal to provide necessary expert regulation comparable with that provided by the State and Federal Governments. On this basis and on the basis that permitting such regulation would be an extreme burden on interstate commerce, *it is the intent that section [136v], by not providing any authority to political subdivisions and other local authorities of or in the States, should be understood as depriving such local authorities and political subdivisions of any and all jurisdiction and authority over pesticides and the regulation of pesticides.*" S. Rep. No. 92–838, pp. 16–17 (1972) (emphasis added).

Clearer committee language "directing" the courts how to interpret a statute of Congress could not be found, and if such a direction had any binding effect, the question of interpretation in this case would be no question at all.

But there is still more. After the Senate Agriculture Committee reported the bill to the floor, it was re-referred to the Committee on Commerce, which reported it out on July 19, 1972. The Report of that Committee, plus the accompanying proposals for amendment of H. R. 10729, *reconfirmed* the interpretation of the Senate and House Agriculture Committees. The Report said:

"While the Agriculture Committee bill does not specifically prohibit local governments from regulating pesticides, the report of that committee states explicitly that local governments cannot regulate pesticides in any manner. Many local governments now regulate pesticides to meet their own specific needs which they are often better able to perceive than are State and Federal regulators." S. Rep. No. 92–970, p. 27 (1972).

The Court claims that this passage, plus the amendment that it explains, show that "the two principal Committees responsible for the bill [were] in disagreement over whether it pre-empted pesticide regulation by political subdivisions." *Ante*, at 610. I confess that I am less practiced than others in the science of construing legislative history, but it seems to me that quite the opposite is the case. The Senate Commerce Committee Report does not offer a different *interpretation* of the pre-emptive effect of H. R. 10729. To the contrary, it acknowledges that the Report of the originating Committee "states explicitly that local governments cannot regulate pesticides in any manner," and then proceeds to a statement ("Many local governments now regulate pesticides, etc.") which questions not the *existence* but the *desirability* of that restriction on local regulatory power. And since it agreed with the interpretation but did not agree with the policy, the Senate Commerce Committee proposed an amendment to H. R. 10729, whose purpose, according to its Report, was to "giv[e] local governments the authority to regulate the sale or use of a pesticide beyond the requirements imposed by State and Federal authorities." S. Rep. No. 92–970, *supra*, at 27. In a supplemental Report, the Senate Agriculture Committee opposed the Commerce Committee's amendment, which it said would "giv[e] local governments the authority to regulate the sale or use of a pesticide," thereby "vitiat[ing]" the earlier Agriculture Committee Report. S. Rep. No. 92–838, pt. 2, *supra*, at 46–47. This legislative history clearly demonstrates, I think, not (as the

Court would have it) that the two principal Senate Committees disagreed about whether H. R. 10729 pre-empted local regulation, but that they were in complete accord that it *did*, and in disagreement over whether it *ought* to.

Of course that does not necessarily say anything about what Congress as a whole thought. Assuming that all the members of the three Committees in question (as opposed to just the relevant Subcommittees) actually adverted to the interpretive point at issue here—which is probably an unrealistic assumption—and assuming further that they were in *unanimous* agreement on the point, they would still represent less than two-fifths of the Senate, and less than one-tenth of the House. It is most unlikely that many Members of either Chamber read the pertinent portions of the Committee Reports before voting on the bill—assuming (we cannot be sure) that the Reports were available before the vote. Those pertinent portions, though they dominate our discussion today, constituted less than a quarter-page of the 82-page House Agriculture Committee Report, and less than a half-page each of the 74-page Senate Agriculture Committee Report, the 46-page Senate Commerce Committee Report, and the 73-page Senate Agriculture Committee Supplemental Report. Those Reports in turn were a minuscule portion of the total number of reports that the Members of Congress were receiving (and presumably even writing) during the period in question. In the Senate, at least, there was a vote on an amendment (the Commerce Committee proposal) that would have changed the result of the supposed interpretation. But the full Senate could have rejected that *either* because a majority of its Members disagreed with the Commerce Committee's proposed policy; *or* because they disagreed with the Commerce Committee's and the Agriculture Committee's interpretation (and thus thought the amendment superfluous); *or* because they were blissfully ignorant of the entire dispute and simply thought that the Commerce

Committee, by asking for recommittal and proposing 15 amendments, was being a troublemaker; *or* because three different minorities (enough to make a majority) had each of these respective reasons. We have no way of knowing; indeed, we have no way of knowing that they had any *rational* motive at all.

All we know for sure is that the full Senate adopted the text that we have before us here, as did the full House, pursuant to the procedures prescribed by the Constitution; and that that text, having been transmitted to the President and approved by him, again pursuant to the procedures prescribed by the Constitution, became law. On the important question before us today, whether that law denies local communities throughout the Nation significant powers of self-protection, we should try to give the text its fair meaning, whatever various committees might have had to say—thereby affirming the proposition that we are a Government of laws, not of committee reports. That is, at least, the way I prefer to proceed.

If I believed, however, that the meaning of a statute is to be determined by committee reports, I would have to conclude that a meaning opposite to our judgment has been commanded three times over—not only by one committee in each House, but by *two* Committees in one of them. Today's decision reveals that, in their judicial application, Committee reports are a forensic rather than an interpretive device, to be invoked when they support the decision and ignored when they do not. To my mind that is infinitely better than honestly giving them dispositive effect. But it would be better still to stop confusing the Wisconsin Supreme Court, and not to use committee reports at all.

*        *        *

The Court responds to this concurrence in a footnote, *ante*, at 610–612, n. 4, asserting that the legislative history is

really ambiguous. I leave it to the reader to judge. I must reply, however, to the Court's assertion that the "practice of utilizing legislative history reaches well into [our] past," *ante*, at 612, n. 4, for which proposition it cites an opinion written by none other than John Marshall himself, *Wallace* v. *Parker*, 6 Pet. 680 (1832). What the Court neglects to explain is that what it means by the "practice of utilizing legislative history" is *not* the practice of utilizing legislative history for the purpose of giving authoritative content to the meaning of a statutory text—which is the only practice I object to. Marshall used factual statements in the report of an Ohio legislative committee "as part of the record" in the case, *id.*, at 689, 690, assuming that that was permissible "under the laws of Ohio," *ibid.* I do not object to such use. But that is quite different from the recent practice of relying upon legislative material to provide an authoritative interpretation of a statutory text. That would have shocked John Marshall. As late as 1897, we stated quite clearly that there is "a general acquiescence in the doctrine that debates in Congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body." *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 318. And even as late as 1953, the practice of using legislative history in that fashion was novel enough that Justice Jackson could dismiss it as a "psychoanalysis of Congress," and a "weird endeavor." *United States* v. *Public Utilities Comm'n of Cal.*, 345 U. S. 295, 319 (concurring opinion). It is, in short, almost entirely a phenomenon of this century—and in its extensive use a very recent phenomenon. See, *e. g.*, Carro & Brann, Use of Legislative Histories by the United States Supreme Court: A Statistical Analysis, 9 J. Legis. 282 (1982); Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L. Rev. 195, 196–197 (1983).

I am depressed if the Court is predicting that the use of legislative history for the purpose I have criticized "will . . .

reach well into the future." But if it is, and its prediction of the future is as accurate as its perception that it is continuing a "practice . . . reach[ing] well into [our] past," I may have nothing to fear.