**James DESHOTEL d/b/a James Deshotel Farms**

v.

**RHONE-POULENC, INC.**

Civil Action No. 94–2085.

United States District Court,
W.D. Louisiana,
Alexander Division.

March 31, 1997.

Jerry A. Johnson, Office of Thomas W. Sanders, Lake Charles, LA, Winfield Earl Little, Jr., Lake Charles, LA, for Plaintiff.

Gary A. Bezet, Robert E. Dille, Kean, Miller, Hawthorne, Darmond, McCowan & Jarman, Baton Rouge, LA, for Defendant.

### REASONS FOR JUDGMENT

LITTLE, Chief Judge.

The etymology of entomology is not necessary to resolve this suit, but a definition is demanded. Entomology is the study of insects. Resolution of this civil suit requires the court to practice entomology to determine which type of insects damaged plaintiff's sweet potatoes.

This action came before the court for a bench trial on 6 January 1997. The plaintiff, James Deshotel d/b/a James Deshotel Farms (hereafter "Deshotel") seeks $208,137.00 in compensatory and redhibitory damages plus interest and attorneys' fees from defendant Rhone–Poulenc, Inc. The damages represent pest losses to Deshotel's 1994 sweet potato crop allegedly caused by the failure of a pesticide manufactured by Rhone–Poulenc. The court has jurisdiction over the case pur-

suant to 28 U.S.C. § 1332. Venue is proper. Upon a review of the evidence presented at trial, as well as the pleadings and post-trial memoranda of the parties, the court concludes that Deshotel has not established liability on the part of Rhone–Poulenc. The following constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

Deshotel operates a sweet potato farm in Bunkie, Louisiana. He has been farming sweet potatoes since 1980. In 1994, the only crop year in dispute, Deshotel planted 297 acres of Beauregard variety sweet potatoes on three tracts of land near Bunkie. There is no dispute that Deshotel suffered a major crop loss from insect damage.

Sweet potato farming is a continuous process. A typical Louisiana farmer plants a sweet potato in the ground in February. The potato sprouts a vine above ground in April. Beginning in May, the farmer cuts the vine, called a slip, at the surface and transplants the slip to the field for planting. Before the slip can be planted in the field, however, the farmer must prepare the field. Among other things, this involves fertilizing, conditioning the soil, tilling, hipping the rows, and applying a soil insecticide. After planting, the farmer cultivates the field and applies a foliar insecticide against airborne insects As early as 70 days after transplant, the farmer begins to harvest the sweet potatoes. Harvest, storage, and sales continue until the cycle repeats in February.

For his 1994 crop, Deshotel began transplanting sweet potato slips into his fields on or about 20 May. Deshotel could not plant all 297 acres on the same day. Planting at a rate of approximately 10 acres per day, he completed planting on or about 30 June. Deshotel applied a nematicide-insecticide MOCAP 6EC (hereafter "MOCAP") to the soil between two to ten days before he transplanted the slips into each field. Deshotel had used MOCAP with success since at least 1988. In 1994 he began applying MOCAP on or about 15 May, in 20 acre parcels.

MOCAP is manufactured and distributed by Rhone–Poulenc, a foreign corporation. The active ingredient in MOCAP is ethoprop, an organophosphate that is hazardous to humans, as well as various nematodes and insects. MOCAP is a restricted use pesticide registered with the United States Environmental Protection Agency ("EPA") and distributed with a label approved by the EPA.

MOCAP is manufactured in granular and liquid formulas. In 1994 Deshotel, a licensed applicator, used the liquid formula. He injected it into the soil using equipment appropriate for the task.

The MOCAP used by Deshotel was manufactured in batches of 1,000 gallons at Rhone–Poulenc's factory in Mount Pleasant, Tennessee. Each batch was quality tested before being packaged into 2.5–gallon containers for distribution. There is no evidence that the MOCAP used by Deshotel deviated from any other MOCAP manufactured by Rhone–Poulenc in 1994.

The MOCAP label instructs to apply the product "2 to 3 weeks before planting." Deshotel intentionally violated this direction. Other literature distributed by Rhone–Poulenc indicates that MOCAP may be applied immediately before planting. It was uncontroverted at trial that MOCAP may be applied immediately before planting without harming the crop or lessening the effectiveness of the MOCAP. In fact, according to Dr. Rick Story, an entomologist at Louisiana State University ("LSU"), a farmer would be well advised not to apply MOCAP three weeks before planting, as this would lessen the window in which his crop was "protected" by the MOCAP We conclude that Deshotel applied the MOCAP properly, as directed by Rhone–Poulenc.

The MOCAP label states that when used properly for sweet potato farming, MOCAP will "control" 12 types of pests, including the banded cucumber beetle and two species of the wireworm, *conoderus verspertinus* and *melanotus spp.* Wireworms are the larval stage of the click beetle. Some species of the wireworm have an annual life cycle, while others have two generations per year. The banded cucumber beetle has a generation cycle of less than 30 days. The cucumber beetle egg hatches in five to seven days and

enters the larval stage. It is in the larval stage that both the wireworm and cucumber beetle damage the sweet potato. They scar the potato, leaving behind craters of various depths. This cratering greatly reduces the cash value of the sweet potato.

The MOCAP label does not specify the meaning of "control," nor a lower level of pest regulation termed "supression."[1] "Control" was mentioned no fewer than 125 times at trial. Repetition did not contribute to comprehension, and neither party has suggested a legal definition. Deshotel proposed the following meaning: "[C]ontrol would tell you that, you know, this chemical will work. It will kill the insect that y'all are after. Suppress would tell you, you know, it might give you some kind of control, but it will not kill all the insects that's there."[2] Transcript, pp. 52:21–53:1 We find more useful as an industry standard the quantifiable analysis expressed by Joe Don Powell, an entomologist and pest management agent for the LSU Cooperative Extension Service. "Control" means killing in excess of 90 percent of the targeted pests at the time of application; "suppress" means killing in excess of 50 percent of the targeted pests at the time of application. How long this "control" is expected to last, however, is a separate and essential question.

It is commonly known and was admitted by Deshotel that MOCAP is not a paladin that protects sweet potatoes forever To the contrary, MOCAP only "controls" specific pests in the soil during its effective period. Critically, MOCAP has no impact on adult airborne pests. MOCAP thus cannot prevent pests from flying into the field and laying eggs. If these eggs develop into larvae after the effective period of MOCAP has subsided or expired, the pests may penetrate and damage the sweet potatoes. A portion of a pest population may also be expected to develop a genetic resistance to a pesticide.[3]

The MOCAP label does not state an effective period. Rhone–Poulenc advertises that the effective period is "up to eight weeks." Deshotel testified that he understood the effective period of the product to be 90 days. He reached this understanding prior to 1994 based on conversations with Mike Redlich, a sales representative for Rhone–Poulenc, and on programs at growers' meetings.

Based on the testimony of entomologist Dr. Story, LSU entomologist Dr. Dale Pollet, and entomologist and pest management agent Powell, it is obvious that the actual effective period of MOCAP is between four and six weeks. The effective period depends on variables including soil temperature, moisture, sunlight, and distribution of the chemical. The efficacy of MOCAP is also not as strong at the end of the "effectiveness period" as at the beginning. Dr. Pollet testified that "maximum killing" would occur for 21–28 days.

Because MOCAP and other pre-plant soil insecticides have a limited effectiveness period, it is the standard in the sweet potato industry, as established by the LSU Agricultural Center Cooperative Extension Service, for a farmer to apply foliar insecticides to the sweet potato slips starting 21 days after transplanting the slips into the field. These foliar insecticides are applied a minimum of once every seven days. If field tests demonstrate a high concentration of harmful insects; spraying may occur more frequently. The foliar treatment continues until approximately one week before harvest.

The purpose of the foliar sprays is to interdict adult insects flying into the field. The farmer's goal is to prevent those insects from laying eggs that may develop into potato-damaging larvae as the soil insecticide loses its effectiveness. Foliar applications have no direct effect on the eggs and larvae, just as soil insecticides have no direct effect on the adults. Accordingly, if a field is infested by invading adult insects which have time to

---

1. MOCAP is not specifically labeled to "suppress" nematodes or insects for sweet potatoes.

2. We note that this standard is akin to Justice Stewart's infamous "I'll know it when I see it" test for obscenity in *Jacobellis v. State of Ohio,*

378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

3. Considering that many pesticides pose substantial environmental hazards, pesticides are not the agricultural panacea some profess.

produce larvae in the soil, and the soil insecticide is no longer potent, the farmer's battle is lost. The beetle has won. Subsequent foliar spraying will not reach the larvae, and the farmer cannot apply a soil insecticide after the sweet potatoes have been planted.

Deshotel was aware of the industry standards for foliar spraying. He professed a belief that they were correct and an intention to follow them. In 1994 he applied three types of foliar insecticides: 205 gallons of Sevin XLR Plus, 200 gallons of Thiodan or its equivalent, and 111.5 gallons of methyl parathion. Each of these pesticides is intended to kill adult wireworms (click beetles) and banded cucumber beetles, among others.

It is apparent, however, that Deshotel failed to follow the industry standards for foliar insecticides in 1994. If he had, he would have begun spraying by 10 June, 21 days after transplanting. In fact, Deshotel did not purchase any foliar insecticide until 21 June. This purchase of 20 gallons of Sevin would only cover 80 acres at the labeled application rate. Deshotel's next foliar insecticide purchases were 30 June (50 gallons of Sevin; 200 acres) and 11 July (20 gallons of Sevin; 80 acres) We conclude that Deshotel failed to follow the sweet potato industry's, and his own, practices for protecting against post-emergent insect infestation.

Deshotel began noticing problems with his 1994 crop in early July. The sweet potatoes he dug up had numerous small holes in them. These problems persisted throughout the harvest.

It is undisputed that the holes in Deshotel's sweet potatoes were damaged by insects. It is also undisputed that the damage substantially reduced the value of Deshotel's 1994 crop. Sweet potatoes with insect holes understandably sell at a lower price. The potatoes with deep holes Deshotel could not sell at all.

The most critical factual dispute concerns whether the damage to Deshotel's crop was caused by wireworms, as Deshotel claims, or the banded cucumber beetle, as Rhone–Poulenc asserts. This is an important and close issue. The reason it is important is that if banded cucumber beetles caused the damage,

Rhone–Poulenc's theory is supported that the beetles invaded the field in June when Deshotel did not properly apply foliar insecticides. To the contrary, if wireworms caused the damage, Deshotel's foliar applications would not make a difference because the wireworm, an annual or semi-annual reproducer, already would have been in the soil. In that case we would be more likely to conclude that Deshotel's damages were caused by defective MOCAP.

Deshotel introduced the testimony of several farmers, a parish agricultural agent, and a horticulturist, each of whom opined that the damage was from wireworms. Their conclusions were based on inspections of the scarred potatoes. Defendant's entomologists testified that one could not distinguish wireworm and cucumber beetle damage to a sweet potato simply by looking at the damaged potato. Field testing was required.

Redlich set between 15 and 20 wireworm traps in the Deshotel fields between July and September 1994. The traps, using corn and barley as bait, were placed in areas where crop damage was already reported. If wireworms were present they should have been attracted to the bait. The traps did not catch a single wireworm. In fact, not a single witness testified that he had seen any wireworms in the Deshotel soil. To the contrary, it was uncontested that adult banded cucumber beetles were present in the Deshotel field throughout the 1994 harvest.

We conclude that the pest damage to Deshotel's field more likely than not was caused by the banded cucumber beetle, not the wireworm. We are not convinced that Deshotel's 1994 crop failure was caused by ineffective MOCAP It is more likely that Deshotel's tardy foliar insecticide application was to blame.

II.

The legal bases for Deshotel's claims are, to say the least, muddled. Deshotel's posttrial brief was devoid of any mention of the law. The pre-trial brief was little better except for a rebuttal of Rhone–Poulenc's anticipated defense. We look to Deshotel's complaint and amended complaint to decipher his legal claims.

We interpret Deshotel's amended complaint to state causes of action under six theories: (1) strict product liability for defective construction or composition, La.Rev.Stat. § 9:2800.54(B)(1); (2) strict product liability for failure to warn of a known defect, La. Rev.Stat. § 9:2800.54(B)(3); (3) strict product liability for failure to conform to express warranty, La.Rev.Stat. § 9:2800.54(B)(4); (4) redhibition, La.Civ.Code art. 2520; (5) breach of express written warranty; and (6) breach of oral warranty. Louisiana substantive law applies in this diversity case. We will consider each of Deshotel's claims in turn, but first assess the question of preemption by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y.

### III.

FIFRA is a comprehensive federal statute that regulates pesticide use, sales, and labeling, and grants enforcement power to the EPA. *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 601, 111 S.Ct. 2476, 2479–80, 115 L.Ed.2d 532 (1991). FIFRA expressly prohibits states from imposing "any, requirements for labeling or packaging in addition to or different from those required" under, it. 7 U.S.C. § 136v(b).

■ The Supremacy Clause of the Constitution invalidates any state laws that "interfere with, or are contrary to" federal laws. U.S. Const. art. VI, cl. 2. Because of the Supremacy Clause, a state law that conflicts with federal law' is "without effect." *Wisconsin Pub. Intervenor*, 501 U.S. at 605–07, 111 S.Ct. at 2482.

■ The Fifth Circuit has held that FIFRA § 136v(b) preempts "only those state laws that impose or effect different or additional labeling requirements." *MacDonald v. Monsanto Co.* 27 F.3d 1021, 1025 (5th Cir.1994). The *MacDonald* court clarified that state common law judgments are "requirements" for purposes of preemption. *Id.* (rejecting analysis used in *Ferebee v. Chev-*

*ron Chem. Co.*, 736 F.2d 1529 (D.C.Cir. 1984)).

■ In this case, it is uncontested that MOCAP is a registered pesticide with a label approved by the EPA pursuant to FIFRA. Because a judgment against Rhone–Poulenc on the label-based claims for failure to warn of a known defect, failure to conform to an express warranty, and breach of an express warranty would "effect different or additional labeling requirements," we find that each of those claims is preempted. *MacDonald*, 27 F.3d at 1025; *Prather v. Ciba–Geigy Corp.*, 852 F.Supp. 530, 532 (W.D.La.1994); *Taylor AG Industries v. Pure–Gro*, 54 F.3d 555 (9th Cir.1995). Deshotel's claims for failure to warn of a known defect, failure to conform to an express warranty, and breach of an express warranty accordingly are dismissed.

■ We next consider if Deshotel's claims for redhibition and breach of an express oral warranty are preempted.[4] Mindful that preemption is to be applied narrowly, this court previously held that FIFRA does not necessarily preempt claims for (1) redhibition of the sale of defective pesticide, and (2) breach of voluntarily undertaken warranties. *Prather*, 852 F.Supp. at 532. Further defining *Prather*, we find that where a claim for redhibition is based on a failure to warn or a label defect, the claim is preempted by FIFRA. Conversely, if the redhibition claim is not label-based, for instance if it is based on a manufacturing defect and a remedy would not "impose or effect a labeling requirement," FIFRA preemption does not apply. In this case, Deshotel's redhibition claim might be based on both a manufacturing and labeling defect. To the extent that Deshotel's redhibition claim relates to defective labeling, the claim is preempted. We will consider the substance of the surviving portion of Deshotel's redhibition claim after our substantive analysis of Deshotel's product liability claim.

Previous legal analysis of the FIFRA preemption of express oral warranties has not been acute. The Ninth Circuit has ruled

---

**4.** Deshotel's strict product liability claim that MOCAP is unreasonably dangerous in construction or composition is not preempted. *See Worm v. American Cyanamid Co. (Worm II)*, 5 F.3d 744,

749 (4th Cir.1993) (allowing state law claims for negligent testing, formulation, or manufacture of pesticide).

that implied warranty claims are preempted by FIFRA because the implied warranties operate by state law to impose labeling requirements indirectly. *Taylor AG Industries,* 54 F.3d at 563; *see also Papas v. Upjohn Co. (Papas II),* 985 F.2d 516, 519–20 (11th Cir.1993). We find compelling the argument that if an oral warranty amends a FIFRA-approved label that disclaims all oral warranties, a claim for breach of the oral warranty should be preempted by FIFRA. We do not, however, need to reach a legal conclusion as to the FIFRA preemption of oral warranties. In this case, plaintiff Deshotel has not established that he acted in reliance on any oral warranty, that warrantor Mike Redlich was authorized to make a warranty on behalf of the defendant, or that the purported warranty has been breached, Deshotel's claim for breach of an oral warranty is therefore dismissed.

### IV.

Having determined that FIFRA preempts the majority of Deshotel's claims, we consider the substance of the surviving causes of action. Deshotel contends that Rhone–Poulenc is strictly liable for the defective construction or composition MOCAP pursuant to La.Rev.Stat. § 9:2800.54(B)(1) of the Louisiana Product Liability Act. To succeed on such a claim, Deshotel has the burden of proving that the MOCAP he purchased was "unreasonably dangerous in construction or composition," meaning "at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La.Rev. Stat. § 9:2800.55.

Quite simply, Deshotel failed to produce at trial any evidence that the MOCAP he purchased deviated from Rhone–Poulenc's specifications or performance standards. We have identified several other possible causes of Deshotel's crop failure, including environmental conditions and improper application of foliar insecticides by Deshotel. In that we do not find that "the only reasonable and fair conclusion is that the accident was due to a breach of duty on defendant's part," the evidentiary doctrine of *res ipsa loquitor* is not applicable to assist Deshotel. *Spott v. Otis Elevator Co.,* 601 So.2d 1355, 1362 (La.1992).

Deshotel's claim for redhibitory damages is similarly flawed. As the plaintiff has been unable to establish any defects in MOCAP, his redhibition claim fails.

### V.

In sum, Deshotel's label-based claims for failure to warn, failure to conform to express warranty, breach of express warranty, and redhibition are preempted by FIFRA. Deshotel has failed to establish Rhone–Poulenc's liability for defective manufacturing, breach of oral warranty, or redhibition, or under any other theory. The court accordingly renders judgment in favor of Rhone–Poulenc.